**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AROR ARK O'DIAH,

                                        Plaintiff,

        v.                                                      No. 9:08-CV-322
                                                                      (TJM)(DRH)

A. MAWHIR, Cayuga Correctional Facility; MICHAEL
CORCORAN, Superintendent, Cayuga Correctional
Facility; SCOTT C. CARLSEN, Superintendent, Ulster
Correctional Facility; P. BUTTARAZZI, Chief
Physician, Cayuga Correctional Facility Inmate Clinic;
JESUS FLORESCA, Chief Physician, Ulster
Correctional Facility Inmate Clinic; K. STEVENSON,
Cayuga Correctional Facility Program Coordinator; Ms.
DALY; MARY WARNER, Nurse Administrator,
Cayuga Correctional Facility; and T. NAPOLI,

                                        Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

AROR ARK O'DIAH
Plaintiff Pro Se
07-A-2463
Collins Correctional Facility
Post Office Box 340
Collins, New York 14034

HON. ANDREW M CUOMO                     ROGER W. KINSEY, ESQ.
Attorney General for the State of New York     Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

_____

        [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Aror Ark O'Diah ("O'Diah"), an inmate in the custody of the New York State Department of Correctional Services (DOCS), commenced this action against against nine DOCS employees pursuant to 42 U.S.C. §§ 1983 and related federal and state law alleging violations of his civil rights.  Second Am. Compl. (Dkt. No. 46.) Presently pending is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b).  Dkt. No. 53.  O'Diah opposes the motion.  Dkt. No. 56.  For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

The facts as alleged in the Second Amended Complaint are assumed to be true for the purposes of this motion.  See subsection II(A) infra.

O'Diah was previously incarcerated at Ulster Correctional Facility ("Ulster"), and Cayuga Correctional Facility ("Cayuga") among other facilities.  Second Am. Compl. ¶ 3. O'Diah alleges that beginning in August 2007, he was, among other things, denied medical care in deliberate indifference to his serious medical needs, retaliated against for filing complaints and grievances, issued false misbehavior reports, denied due process and equal protection, and discriminated against on account of his race and national origin.

On August 8, 2007, defendant K. Stevenson, a Cayuga program director, acting under the direction of defendant Michael Corcoran, Cayuga's Superintendent, told O'Diah that he should participate in the prison's general equivalency diploma GED program even though Stevenson and Corcoran knew that O'Diah had already held a number of advanced degrees.  Second Am. Compl. ¶ 41.  O'Diah alleges that their actions amounted

to "reckless and gross intentional disregard[] for [his] academic credentials."  Id.  O'Diah's refusal prompted an unnamed correctional officer, at the direction of Corcoran and Stevenson, to issue Tier II and Tier III disciplinary charges[2] against O'Diah.  Id.  O'Diah lost his good time credit and was assaulted by another unnamed correctional officer.  Id. ¶ 42.

On September 13, 2007, defendant Jesus Dr. Floresca, a physician at Ulster, examined O'Diah.  Second Am. Compl. ¶ 43.  O'Diah claimed that he had a urinary tract infection because he experienced intense pain along his urinary tract.  Id.  ¶¶ 43-44.  Dr. Floresca prescribed Motrin, which O'Diah refused.  Id. ¶ 44.  Dr. Floresca denied O'Diah's request for a urine analysis and antibiotics.  Id.  O'Diah then lost control and began shouting because of the pain.  Id. ¶ 45.  Dr. Floresca contacted Ulster's security personnel and told them that O'Diah was "crazy."  Id. ¶ 46.  Dr. Floresca and Ulster Superintendent Scott Carlsen, also a defendant herein, took O'Diah to an unnamed Ulster psychiatrist who told Dr. Floresca and Carlsen that O'Diah was not crazy.  Id. ¶ 48.  O'Diah then received a Tier II disciplinary charge, esd gounf huily, and was sentenced to thirty days in keeplock.[3]  Id. ¶ 50.  On September 18, O'Diah was transferred from Ulster to Cayuga where he remained in keeplock.  Id. ¶ 52.  O'Diah appears to allege that this transfer was in

---

[2]DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged.  A Tier II hearing, or disciplinary hearing, is required whenever disciplinary penalties not exceeding thirty days may be imposed.  N.Y. Comp. Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a)﹒  A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed.  Id.

[3]"Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities."  Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

retaliation for some unspecified conduct.  Id. ¶ 88.  Defendant Michael Corcoran, Cayuga's Superintendent, kept O'Diah in keeplock until October 24, six days beyond his thirty-day sentence.  Id. ¶ 53.

On October 24, 2007, prison officials gave O'Diah antibiotics to treat a lesion on his urinary tract.  Second Am. compl. ¶ 55.  He needed treatment for both gram negative and gram positive bacteria but the antibiotics he received were effective against gram negative bacteria only.  Id. ¶ 56.  He also claims that defendants then intentionally and wrongly gave him treatment for cancer, epilepsy, and tuberculosis with the intention of poisoning him.  Id.  That same day, in response to the bacterial diagnosis, O'Diah appealed his Tiers II and III disciplinary determinations from September 13.  Id. ¶ 59.  Corcoran and Carlsen refused to amend the disciplinary determinations.  Id.

Also on October 24, O'Diah requested special access to use the law library for an additional ninety days because he had fallen behind on responding to motions in a matter pending in the United States District Court for the Eastern District of New York.  Second Am. Compl. ¶ 61.  Corcoran granted a thirty-day extension.  Id. ¶ 64.  On November 9, O'Diah informed Cayuga correctional officers that he was no longer in need of the special access.  Id. ¶ 65.  On November 11, O'Diah refused an opportunity to use the library.  Id. ¶ 66.  The next day, he received a Tier II disciplinary ticket, which resulted in thirty days of keeplock.  Id. ¶¶ 67, 69.  O'Diah alleges that the issuance of the disciplinary tickets and his medical mistreatment were in retaliation for his refusal to participate in the GED program in August.  Id. ¶ 68.

O'Diah filed grievances against Corcoran and other Cayuga officials on February 25 and 26, 2008, because they had failed to refund money that was unlawfully seized by

defendant Daly, Cayuga's Deputy Superintendent for Administration, in September 2007. Second Am. Compl. ¶¶ 71-72.  Defendant T. Napoli refused to process the grievances. Id. ¶ 71.  Between November 21, 2007, and March 5, 2008, a number of correctional officers and prison inmates, led by defendant A. Mawhir, physically abused O'Diah by beating him and pouring cold water on him while he was sleeping.  Id. ¶¶ 74-75.  O'Diah filed grievances against Corcoran and other Cayuga officials because they ignored the abuse.  Id. ¶ 74.

O'Diah saw defendant Dr. P. Buttarazzi, a physician at Cayuga, on February 25, 2008, because O'Diah needed antibiotic ointment for a lesion on his urinary tract caused by a bacterial infection.  Second Am. Compl. ¶ 76.  O'Diah told Dr. Buttarazzi that he saw microscopic particles in his urine.  Id. ¶ 77.  Rather than providing antibiotic ointment or conducting medical tests, Dr. Buttarrazzi provided ointment designed to treat an enlarged prostate. Id.  The next day, O'Diah spoke with an unidentified private physician who advised O'Diah not to use the ointment because it would not treat the infection.  Id. ¶ 78.

Prior to February 26, 2008, O'Diah had been placed on high blood pressure watch by two nurses at Cayuga.  Second Am. Compl. ¶ 79.  While at Cayuga's Inmate Health Service on March 4, 2008, Mawhir told O'Diah that O'Diah would not be examined by medical personnel because he had filed grievances against Cayuga officials.  Id. ¶ 80. Mawhir then told O'Diah that he would be placed in segregation even though O'Diah had not been issued disciplinary charges.  Id.

O'Diah was excused from Cayuga's work programs on March 5, 2008, because he was completing blood work with medical personnel.  Second Am. Compl. ¶ 81.  O'Diah, however, alleges that his requests for further medical treatment and additional excuses

5

from work programs were refused as a part of a conspiracy by defendants to deprive him of his constitutional rights.  Id. ¶ 82.  As soon as O'Diah returned, a correctional officer assigned O'Diah to complete "lawn ground and utility work."  Id. ¶ 83.  O'Diah states that his elevated blood pressure, severe dizziness, excruciating headaches, and his urinary tract infection would prevent him from doing such work.  Id.  He argues that prison officials, aware of his health problems, forced him to do such work in retaliation for certain unstated conduct.  Id.  O'Diah requested a grievance form from Napoli but Napoli refused to provide the form.  Id.  Later, unnamed correctional officers unnecessarily pushed him into a wall and threw him onto vehicles.  Id. ¶ 84.  Defendants subjected him to thirty days of confinement without a hearing.  Id.  As a result, he was denied visits or mail and his mail was searched without his consent.  Id.

Three days later, Corcoran and Mawhir refused to provide O'Diah with his legal documents.  Second Am. Compl. ¶ 85.  O'Diah had wanted to provide the documents to a legal processing advocate who would be visiting him at Cayuga.  Id.  O'Diah argues that Corcoran and Mawhir refused to return the documents in retaliation for O'Diah's exercise of his constitutional rights.  Id.  Mawhir then subjected O'Diah to another Tier II disciplinary determination, resulting in an additional thirty days of confinement.  Id.

On March 10, 2008, Daly wrote to O'Diah regarding some of O'Diah's funds that Daly had allegedly unlawfully seized.  Second Am. Compl. ¶¶ 86-87.  O'Diah was then sentenced to sixty days of segregated confinement because his response to Daly had included threats.  Id. ¶ 88.  This determination was reversed on administrative appeal before O'Diah completed the sentence.  Id.

6

O'Diah, an African-American, alleges that Defendants' unlawful and

unconstitutional conduct were all motivated by their animus toward O'Diah's race.  Second

Am. Compl. ¶ 88.

## II.  Discussion

O'Diah brings this action under 42 U.S.C. § 1983, alleging that defendants violated

his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution.  Second Amend. Compl. ¶ 2.  He also alleges violations of 42

U.S.C. §§ 1985, 1986, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.

("ADA"), and N.Y. Correction Law § 138(4).  Id. ¶¶ 2, 9.  He brings this action against

Defendants in their individual and official capacities.  Id.  Defendants contend that O'Diah

has failed to state causes of action upon which relief can be granted, that defendants are

entitled to qualified immunity, and that the claims are barred by the statute of limitations.

### A.  Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim.

When considering a motion to dismiss, "a court must accept the allegations contained in

the complaint as true, and draw all reasonable inferences in favor of the non-movant."

Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, this "tenet . . . is

inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, __

U.S. __, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544,

554-55 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility . . . that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).  Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 129 S. Ct. at 1950-51.

When, as here, the non-moving party is a pro se litigant, the court must afford the non-moving party special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude,"; that a pro se litigant's submissions must be construed "liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]"  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

Id. (internal citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant

8

#1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally." (citations omitted)).

## B. Personal Involvement

Personal involvement is an essential prerequisite for section 1983 liability. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[4]

### 1. Carlsen, Corcoran, and Napoli

Even after construing the second amended complaint liberally, there appear no claim or allegation of personal involvement by either Corcoran, Carlsen, or Napoli. Although Corcoran and Carlsen supervised prison personnel, a position in a hierarchal

---

[4] The Supreme Court's decision in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), arguably casts in doubt the continued viability of some of the categories set forth in Colon. See Sash v. United States, 674 F. Supp. 2d 531 (S.D.N.Y. 2009). Here, it will be assumed arguendo that all of the Colon categories apply.

chain of command, without more, is insufficient to support a showing of personal involvement.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Further, the second amended complaint fails to make any claim that Carlsen or Corcoran failed to train any of the defendants, that Carlsen or Corcoran were grossly negligent in performing their employment duties, or that the two received and responded to any complaints or grievances.

Finally, although defendant Napoli has not moved to dismiss for lack of personal involvement, a review of the second amended complaint reveals that O'Diah has failed to allege sufficient facts showing that Napoli participated in any alleged constitutional violations.[5]  Receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that Napoli took any action.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citation omitted) (finding personal involvement only where official received, reviewed, and responded to a prisoner's complaint).

As such, all claims against Carlsen, Corcoran, and Napoli should be dismissed.

## 2.  Daly and Stevenson

Daly and Stevenson also move to dismiss O'Diah's medical indifference claim based on a lack of personal involvement.  Even after construing the second amended complaint liberally, O'Diah has failed to allege any facts to show the personal involvement

---

[5] Since O'Diah is proceeding in forma pauperis and is suing government officials, the court will address this claim sua sponte pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A.

of either Daly or Stevenson in the alleged medical indifference.  As such, the medical indifference claim should be dismissed as to Daly and Stevenson.

### C.  Verbal Harassment[6]

O'Diah claims that he was verbally harassed by defendants.  Second Amend. Compl. ¶¶ 12, 17, 24-26, 28.  O'Diah, however, fails to allege specific incidents of verbal harassment.  Even if he were to do so, allegations of verbal harassment alone are not actionable under § 1983.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called [plaintiff] names . . . did not allege any appreciable injury and was properly dismissed.); Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983.").  Accordingly,, to the extent that they are based only on verbal harassment, O'Diah's harassment claims should be dismissed as to all defendants.

### D.  First Amendment

### 1.  Retaliation

O'Diah alleges that all of the defendants' alleged unconstitutional actions were in

---

[6]  This section addresses the claimed verbal harassment only.  O'Diah also alleges that defendants' violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were incidents of harassment against him based on his race and national origin and in retaliation for exercising constitutionally protected conduct.  The alleged violations of those rights are addressed in the sections that follow.

retaliation for engaging in constitutionally protected conduct.  To state an actionable claim

for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally

protected and that this protected conduct was a substantial factor that caused the adverse

action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Courts must

view retaliation claims with care and skepticism to avoid judicial intrusion into matters of

prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15

(N.D.N.Y. 2008) (McAvoy, J., adopting report and recommendation of Lowe, M.J.).

Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713

F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed

factual allegations . . . ought usually be pursued with full discovery.")).

There are numerous instances in the second amended complaint where O'Diah

makes a retaliation claim without alleging any facts to establish that any of defendants'

alleged actions were motivated by, or temporally related to, any constitutionally protected

conduct.  All O'Diah offers are conclusory allegations to demonstrate that he was the

victim of retaliatory conduct.  These conclusory allegations, without more, are insufficient

to maintain a claim.  Jackson, 549 F. Supp. 2d at 214.

Also contained in the second amended complaint, however, are other allegations of

retaliation that deserve greater analysis.  First, as to the claims of retaliation for refusing to

participate in the GED program, O'Diah does not have a constitutionally protected right to

refuse such a program.  As such, any claim of retaliation arising from this incident should

be dismissed.  Second, although there may be a temporal connection between O'Diah

losing control in front of Dr. Floresca and O'Diah being kept in keeplock for six days

beyond the imposed sentence, O'Diah did not have a constitutionally protected right to act

out simply because Dr. Floresca refused O'Diah's request for urine analysis and blood work.  Finally, even though O'Diah was confined to keeplock for refusing to take the prescribed medication, disagreeing over the proper course of medical treatment does not raise a constitutional violation.  See Section E(1) infra.  Thus, any claim of retaliation arising out of these incidents should be dismissed.[7]

Although there is no right to file grievances, the right to file a grievance is a constitutionally protected activity for retaliation purposes.  See Davis v. Goord, 320 F. 3d 346, 352-53 (2d Cir. 2003).  O'Diah alleges that he was deprived of medical care on March 4, 2008, because he filed grievances on February 25 and 26, 2008, alleging that prison officials had refused to refund money unlawfully seized by Ms. Daly.  The temporal proximity between the filing of the grievance and the alleged retaliatory act could support a First Amendment retaliation claim.  Accordingly, defendants' motion to dismiss this claim should be denied with respect to this incident and against defendants Mawhir, Dr. Buttarazzi, and Warner.

Liberally construing the second amended complaint, O'Diah alleges that defendants violated New York Correction Law § 138(4).[8]  Correction Law § 138(4) prohibits disciplining inmates who "mak[e] written or oral statements, demands, or requests

---

[7] O'Diah's argument that the deprivation of medical care violated the Eighth Amendment is discussed in subsection E(1) infra.

[8] This argument is addressed in this section as N.Y. Correction Law § 138(4) reflects New York's protection of inmates' First Amendment right to be free from retaliation for engaging in constitutionally protected conduct.  See Salahuddin v. Harris, 657 F. Supp. 369, 376 (S.D.N.Y. 1987) (finding that Correction Law § 138(4) "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests").

involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution."  A federal court may exercise supplemental jurisdiction over a state law claim when that claim arises out of the same facts upon which the federal claim is based. See Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000) (citations omitted).  O'Diah argues that defendants violated Correction Law § 138(4) when they issued disciplinary charges and refused to provide him with the proper medication in retaliation for filing grievances.  Second Amend. Compl. ¶¶ 42, 80.  Because those incidents arise out of the same facts as the federal retaliation claim, the Court should exercise pendent jurisdiction over the state law claim.  Accordingly, defendants' motion to dismiss O'Diah's Correction Law § 138(4) claim should be denied as to Mawhir, Buttarazzi, and Warner.


## 2.  Retaliatory Transfer

Construing the second amended complaint liberally, O'Diah alleges that his September 2007 transfer from Ulster to Cayuga was in retaliation for some unspecified conduct.  Second Amend. Compl. ¶¶ 52, 88.  It is well settled that an inmate does not have a constitutional right to be incarcerated in a particular facility. Montanye v. Haymes, 427 U.S. 236, 243 (1976); Meachum v. Fano, 427 U.S. 215, 224 (1976).  However, prison officials may not transfer an inmate in retaliation for the inmate's exercise of constitutional rights. See Meriwether v. Coughlin, 879 F.2d 1037, 1046 (2d Cir. 1989).  O'Diah fails to allege sufficient facts suggesting that he had exercised any constitutional rights in retaliation for which defendants might have acted.  Thus, the defendants' motion on this ground should be granted.

### 3.  Mail Tampering

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment."  Davis, 320 F.3d at 351 (citations omitted).  While legal mail is afforded the greatest protection, "greater protection [is afforded] to outgoing mail than to incoming mail."  Id. (citations omitted).  "Restrictions . . . are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular governmental interest involved."  Id. (citations omitted).

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Id.  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim."  Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).  "[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation . . . .  Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail."  Id. (citations omitted); see also Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986) (explaining that an action may not give rise to damages if there was "no showing . . . that the inmate's right of access to the courts was chilled or the legal representation was impaired."); Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir. 1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

15

In this case, O'Diah alleges that Corcoran and Mawhir refused to provide O'Diah with documents related to his appeals.  Second Amend. Compl. ¶ 85.  O'Diah wanted to provide the documents to a legal processing advocate who would be visiting him at Cayuga.  Id.  Even if true, this single incident is insufficient to support O'Diah's claim of mail tampering.  Further, the general allegations of mail tampering found elsewhere in the complaint are insufficient to establish a constitutional violation.  With respect to those claims, O'Diah has failed to plead with any particularity with what mail defendants tampered.  Those conclusory allegations make no reference to time, place, person or manner of tampering.

As such, defendants' motion should be granted as to this claim.


### E.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.


### 1.  Medical Care

This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial

16

risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable medical indifference claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by such factors as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 413 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the needs for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312

17

(S.D.N.Y. 2001).

In this case, defendants do not appear to challenge that O'Diah was suffering from a serious medical condition.  Instead, defendants assert only that O'Diah has failed to allege deliberate indifference by defendants.  For the purposes of the pending motion, it will be assumed that O'Diah suffered a serious medical condition,[9] and suffered substantial pain arising from the infection.  Second Amend. Compl.  ¶¶ 43-44.

Defendants argue that their actions amounted to nothing more than a mere disagreement with O'Diah regarding his treatment.  Defs. Mem. of Law at 18-20.  O'Diah argues that defendants refused to provide the proper treatment in retaliation for O'Diah's refusal to participate in the GED program.  Second Amended. Compl. ¶ 53.  Although the refusal to participate in a GED program is not a protected right, the refusal to provide the proper treatment for non-medical reasons may demonstrate an intentional disregard for O'Diah's serious medical needs.  Moreover, Dr. Floresca did not conduct a test to determine whether O'Diah had a urinary tract infection before providing O'Diah with Motrin.  Id. ¶¶ 43-44.  Likewise, defendant Dr. Buttarazzi did not conduct any tests on O'Diah before prescribing an ointment for an enlarged prostate.  Id. ¶¶ 77-78.  Construing these facts in the light most favorable to O'Diah, he has advanced a claim that defendants' actions rose past a level of mere disagreement and into one of intentional disregard. Further, the refusal to provide O'Diah with a medical examination on March 4, 2008, because he had filed grievances against Cayuga officials could support a claim for deliberate indifference.

─────────────────────

[9] See Santiago v. Stamp, 303 F. App'x 958 (2d Cir. Dec. 23, 2008) (assessing deliberate indifference prong where plaintiff suffered from a urinary tract infection).

Accordingly, defendants' motion to dismiss the medical indifference claim should be denied with respect to Drs. Buttarazzi and Floresca and as to Warner but granted in all other respects.

### 2.  Working Conditions

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  Farmer, 511 U.S. at 825; Hathaway, 37 F.3d at 66. Establishing an Eighth Amendment claim based on medically inappropriate working conditions requires the plaintiff to show that (1) he was incarcerated under conditions that posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  Farmer, 511 U.S. at 834.  Such a claim may be analogized to a claim for inadequate medical care, which also requires proof of deliberate indifference.  See, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) (prisoner alleged Eighth Amendment medical claim when he alleged that prison guards deliberately ignored doctor's order that prisoner pursue exercise in gym); Cooke v. Stern, No. 9:07-CV-1292 (GLS/ATB), 2010 U.S. Dist. LEXIS 88387, at *24-30, 2010 WL 3418393, at *6-8 (N.D.N.Y. Aug. 2, 2010) (Baxter, M. J.) (alleging of Eighth Amendment medical claim where prison officials assigned plaintiff to a work that a doctor determined to be inappropriate for his medical condition); Atkinson v. Fischer, No. 9:07-cv-00368 (GLS/GHL), 2009 U.S. Dist. LEXIS 88480, at *4-5, 2009 WL 3165544, at *2 (N.D.N.Y. Sept. 25, 2009) (same).

"The deliberate indifference standard embodies both an objective and subjective

19

prong." Hathaway, 37 F.3d at 66.  Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to make out a constitutional violation.  Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  An inmate may satisfy this element by alleging that his prison work duties created a substantial risk of serious injury or harm.  Howard v. Headly, 72 F. Supp. 2d 118, 123-24 (E.D.N.Y. 1999) (collecting cases).

The subjective element focuses on whether the defendant acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (citing Wilson, 501 U.S. at 300).  "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.  Farmer, 511 U.S. at 835.  A prison official acts with deliberate indifference when he knows of and disregards an excessive risk to an inmate's health or safety.  Hathaway, 37 F.3d at 66.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Id.

Defendants characterize O'Diah's allegation regarding his assignment to lawn and ground utility work as a Due Process claim based on not receiving the work assignment of his choice.  See Defs. Mem. of Law at 12. A "New York [state] . . . prisoner has no protected liberty interest in a particular job assignment." Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996).  However, forcing O'Diah to complete a job assignment with the intention of aggravating his medical condition could state a claim for violating O'Diah's right against unconstitutional conditions of confinement.

As such, defendants' motion to dismiss this claim should be denied as to Warner, Dr. Buttarazzi, Stevenson, and Mawhir.

### 3. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violations under 42 U.S.C. § 1983. Hudson, 503 U.S. at 9-10. The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must satisfy both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 502 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9); see also Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) ("The 'core judicial inquiry' . . . was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 502 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (citation omitted).

21

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Id. (quoting Hudson, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five facts to consider:

> "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Liberally construing O'Diah's second amended complaint, he has satisfied the objective component of the excessive force inquiry.  The second amended complaint alleges that Mawhir and others repeatedly poured cold water on O'Diah without provocation and while O'Diah was sleeping.  Although one incident might be insufficient to state an Eighth Amendment violation, O'Diah alleges that this occurred "whenever [he] was sleeping."  Second Amend. Compl. ¶ 74.  Such repeated conduct would rise beyond de minimis use of physical force and evinces maliciousness.  Moreover, in addition to pouring cold water on O'Diah, O'Diah alleges that Mawhir had joined other inmates in beating O'Diah without provocation.  Accordingly, defendant's motion to dismiss the excessive force claim should be denied as to Mawhir but granted in all other respects.[10]

---

[10]O'Diah has also alleged other incidents where he was assaulted by unnamed correctional officers.  Second Amend. Compl. ¶¶ 42, 74-75.  However, O'Diah has failed to

### 4.  Failure to Protect

Eighth Amendment obligations also include the duty to protect prisoners from

known harms.  Farmer, 511 U.S. at 829.  "The Constitution does not mandate comfortable

prisons but neither does it permit inhumane ones, and it is now settled that the treatment a

prisoner receives in prison and the conditions under which he is confined are subject to

scrutiny under the Eighth Amendment."  Id. at 832.  Where the inmate is alleging "a failure

to protect harm, the inmate must show that he is incarcerated under conditions posing a

substantial risk of serious harm."  Id. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31-32

(1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective .

. . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations

omitted).  To state a cognizable failure to protect claim, (1) "the inmate [must be]

incarcerated under conditions imposing a substantial risk of serious harm," and (2) the

prison offic[ial] must "know of and disregard an excessive risk to inmate health and safety;

the official must be both aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference."  Matthews v.

Armitage, 36 F. Supp. 2d 121, 124-25 (N.D.N.Y. 1999) (internal citations and quotation

---

allege any claims against John Doe or Jane Doe defendants.  To the extent that O'Diah is
alleging excessive force against these unnamed correctional officers, he must file an
amended complaint in accordance with N.D.N.Y.L.R. 7.1(a)(4).  Moreover, although not
raised in the second amended complaint, O'Diah's reply to defendants' motion accuses
defendants of "repeatedly" stripping him, shackling him, and parading him around like a
slave. Dkt. No. 56 ¶ 40.  The defendants also allegedly told O'Diah that he had to do
"what his master had told him to do."  Id.  If true, this incident could support an Eighth
Amendment claim.  To the extent that O'Diah intends to rely on this allegation, however,
he must file an amended complaint in accordance with Local Rule 7.1(a)(4).

marks omitted).

Liberally construing O'Diah's complaint, he alleges that defendants failed to protect him from beatings by other inmates.  At best, however, the allegations are sufficient to state the elements of a constitutional claim against Mawhir only.  Mawhir allegedly participated in beating O'Diah and failed to prevent other inmates from doing so even though Mawhir was aware of the beatings.  Second Amend. Compl. ¶ 74-75.  Accordingly, defendants' motion to dismiss should be denied with respect to Mawhir but should be granted as to all other defendants.

### F.  Due Process

An inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property.  See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001).

### 1.  Grievance Procedures

"Prisoners, including pretrial detainees, have a constitutional right to access to the courts . . . ." Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 1994) (internal quotation marks omitted) (citing Bounds v. Smith, 430 U.S. 817, 21-22 (1977) (citations omitted) (holding that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts).  "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." Shell

24

v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (citations omitted).  However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."  Id. at 370 (citations omitted).

In this case, O'Diah alleges that Napoli refused to process O'Diah's grievance petition, and, on one occasion, refused to provide O'Diah with a grievance form.  Second Amend. Compl. ¶¶ 69, 71, 73-74, 83, 90.  However, O'Diah cannot allege facts sufficient to establish that he had a liberty interest which required constitutional protection.  Rather, O'Diah uses conclusory language to make broad claims of unconstitutional conduct.  As such, defendants' motion to dismiss on this ground should be granted.


### 2.  Disciplinary Determinations and Keeplock Confinement

To establish a protected interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  In the context of prison disciplinary proceedings, this standard requires that the confinement was atypical and significant in relation to ordinary prison life.  Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999); Frazier, 81 F.3d at 317.

O'Diah alleges that his due process rights were violated during various disciplinary hearings.  However, O'Diah was never sentenced to confinement for more than thirty days.  "[K]eeplock . . . of 30 days or less in New York prisons is not 'atypical or significant hardship' under Sandin."  Auleta v. LaFrance, 233 F. Supp. 2d 396, 398 (N.D.N.Y. 2010) (citing Williams v. Keane, No. Civ. 95-0379(AJP)(JGK), 1997 U.S. Dist. LEXIS 12665, at *13-22, 1997 WL 527677, at *6-8 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (citing cases)).  To the extent that O'Diah also alleges that he lost certain privileges, "the loss of phone,

package, and commissary privileges does not give rise to a protected liberty interest under New York law." Smart v. Goord, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) (citing Husbands v. McClellan, 990 F. Supp. 214, 217 (W.D.N.Y. 1998), citing in turn Frazier, 81 F.3d at 317).

O'Diah alleges that on at least one occasion, he was confined to keeplock for thirty-six days, six days beyond the imposed sentence. Second Amend. Compl. ¶ 51. As to this claim, more intensive fact-finding is required and dismissal at this stage is precluded on this ground. See Sealey v. Giltner, 116 F.3d 47, 52 (2d Cir. 1997) ("we have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement."). Therefore, defendants' motion on this ground as to O'Diah's claim based on the alleged service of thirty-six days in keeplock should be denied.

As to the merits of O'Diah's Due Process claims, inmates are not given "the full panoply of [due process] rights" but are still afforded procedural process. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted). O'Diah's only claims here rest on allegations that are wholly conclusory. He fails to allege facts from which a reasonable fact-finder could conclude that he failed to receive adequate advanced notice, an opportunity to be heard, a fair hearing officer, or any of the other aspects of fairness in the proceedings to which he was due.

26

As such, defendants' motion as to this ground should be granted.

### 3.  Defamation

O'Diah makes broad claims that defendants defamed him.  Second Am. Compl. ¶ 70.  With one possible exception, O'Diah fails to allege any specific instances of defamation.  Rather, he merely makes conclusory allegations accusing officials of slander and libel.  Thus, his defamation claim falls far short of the plausibility standard required by Ashcroft v. Iqbal.  Iqbal,  129 S. Ct. 1937, 1949 (2009) ( ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ") (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Construing the Second Amended Complaint liberally, O'Diah appears to claim Dr. Floresca and Carlsen defamed him when those defendants told Ulster personnel that O'Diah was "crazy."  Second Amend. Compl. ¶¶ 46-48.  Even if this statement were defamatory, a "state defamation action for slander by a government official, without more, cannot be converted into a federal action for loss of liberty under the Due Process Clause of the Fourteenth Amendment."  Patterson v. City of Utica, 370 F.3d 322, 328 (2d Cir. 2004); see also Paul v. Davis, 424 U.S. 693, 709 (1976).  "Section 1983 requires that the alleged conduct violate a constitutionally safeguarded right."  Venable v. Goord, No. 03 Civ. 4434 (RMB), 2004 U.S. Dist. LEXIS 18275, at *13, 2004 WL 2033069, at *5 (S.D.N.Y. Sept. 7, 2004) (citing Savage v. Snow, 575 F. Supp. 828, 837 (S.D.N.Y. 1983)).

Thus, defendants' motion as to O'Diah's defamation claim should be granted.

27

### 4.  Forced Participation in GED Program

O'Diah accuses Stevenson and Corcoran of "reckless and gross intentional disregards [sic] for [O'Diah's] academic credentials" because they forced O'Diah into a GED program.  While O'Diah may not agree with the necessity to complete the program, "it is not the function of this court to micromanage the New York prison system or to second guess officials, including those regarding programming."  <u>Sumpter v. Skiff</u>, No. 05-cv-868, 2008 WL 4518996, at *9 (N.D.N.Y. Sept. 30, 2008).  Rather, the court's function "in a case of this nature is to ensure that the rights guaranteed to a prison inmate by the United States Constitution and federal law are protected."  <u>Id</u>.  Further, "prison officials have a relatively strong interest in maintaining order in the prison and encouraging inmates to comply with mandatory programs as part of their rehabilitation."  <u>Dixon v. Leonardo</u>, 886 F. Supp. 987, 993 (N.D.N.Y. 1995).  Therefore, even if defendants forced O'Diah to participate in a GED program, defendants did not deprive O'Diah of a constitutional right.  Accordingly, O'Diah has failed to present a cognizable claim and defendants' motion as to this claim should be granted.


### 5.  Confiscation of Property

O'Diah contends that Daly unlawfully confiscated his property.  Second Amend. Compl. ¶¶ 71-72, 86-87.  An inmate has a right not to be deprived of property without due process.  However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.  <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984).  "An Article 78 proceeding permits a petitioner to submit

28

affidavits and other written evidence, and where a material issue of fact is raised, have a trial on the disputed issue, including constitutional claims." Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) (citations omitted); see also N.Y. C.P.L.R. §§ 7803, 7804; Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of an act done . . . within the scope of . .. employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2).

In this case, O'Diah contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated by Daly. Such claims fail as a matter of law for several reasons. First, the Article 78[11] procedure exists and affords an adequate state court remedy. Second, because O'Diah is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.


## G.  Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons

---

[11] N.Y. C.P.L.R. art 78 (McKinney 1994 & Supp. 2007) (establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439

(1985); Philips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2006) ("To prove a violation of the

Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently

than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse
> treatment of individuals compared with other similarly situated individuals if
> such selective treatment was based on impermissible considerations such as
> race, religion, intent to inhibit or punish the exercise of constitutional rights,
> or malicious or bad faith intent to injure a person.

Vega v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and

citations omitted).

In this case, O'Diah alleges that, as an African American, he was treated differently

from others but has failed to show how he was treated differently.  Vague and conclusory

allegations of Equal Protection violations are insufficient to state a claim.  See, e.g., John

Gil Constr. Inc. v. Riverso, 99 F. Supp. 2d 345, 353 (S.D.N.Y. 2000) ("[A]ssertions of

selective enforcement and racial animus [that] are wholly conclusory and unaccompanied

by any supporting allegations . . . are insufficient to state a claim under the Equal

Protection Clause or 42 U.S.C. § 1983") (citations omitted).  Accordingly, defendants'

motion should be granted on this ground.


## H.  Conspiracy

O'Diah alleges that the defendants conspired together to deprive him of his

constitutional rights.  "Section 1985 prohibits conspiracies to interfere with civil rights."

Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a

claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29, 103 S. Ct. 3352 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007). "In addition, the conspiracy must be motivated by some class-based animus." Hasty, 490 F.3d at 176 (citations omitted).

Once again, O'Diah does not assert any facts giving rise to a conspiracy. First, O'Diah vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights"). Second, there has been proffered no evidence relating to agreements between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive O'Diah of his civil rights.

Third, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." Webb v. Goord, 340 F.3d 105, 110 (2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). O'Diah's conclusory allegations of a conspiracy against him fail to provide any factual basis plausibly to support a meeting of the minds between the defendants or that defendants entered into an agreement to violate his rights.

31

Finally, even if O'Diah's allegations were found to be more than merely conclusory, O'Diah's conspiracy claims are barred by the "intra-corporate conspiracy" doctrine.  The doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity."  Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) (citation omitted); see also Orafan v. Goord, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotation marks omitted).

An exception exists if the individuals are motivated by personal interests, separate and apart from the entity.  Orafan v. Goord, 411 F. Supp. 2d at 165.  To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias.  See Peters v. City of New York, No. 04-cv-9333 (LAK), 2005 U.S. Dist. LEXIS 2303, at *10-11, 2005 WL 387141, at *4 (S.D.N.Y. Feb. 16, 2005).  "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intra-corporate conspiracy doctrine."  Everson, 216 F. Supp. 2d at 76 (citations omitted).

In this case, all of the defendants were DOCS employees during the period set forth in the second amended complaint and all were acting within the scope of their employment.  Therefore, the intra-corporate conspiracy doctrine applies.  Additionally, the exception to the doctrine does not apply here.  O'Diah does not claim that each defendant was pursuing his or her independent personal interests, but merely that their actions were motivated by their personal bias against his "African origin."  Accordingly, defendants' motion as to O'Diah's § 1985(3) claim should be granted.

32

O'Diah also alleges violations of 42 U.S.C. § 1986.  If any defendant "ha[d] knowledge that any of the wrongs . . . mentioned in section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] to do so . . . , [he] shall be liable to the party injured.  42 U.S.C. § 1986.  However, a "claim under section 1986 lies only if there is a viable conspiracy claim under section 1985."  <u>Gagliardi v. Vill. of Pawling</u>, 18 F.3d 188, 194 (2d Cir. 1994).  No such claim exists here.

Accordingly, defendants' motion as to O'Diah's § 1986 claim should be granted.


## I.  ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. Title II applies to state inmates.  <u>Giraldi v. Bd. of Parole</u>, No. 04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008).  To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

<u>Clarkson v. Coughlin</u>, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment . . . substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the

individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

If a plaintiff fails to identify the specific activity limited by the impairment and fails to allege

that it constitutes a major life activity, the ADA claim must be dismissed.  Reeves v.

Johnson Controls World Servs., 140 F.3d 144, 153-54 (2d Cir.1998).

First, a claim under the ADA cannot be brought against individuals and, therefore,

the claims against the individual defendants under the ADA must be dismissed. See Fox

v. State Univ. of N.Y., 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007); Hallet v. New York State

Dep't of Corr. Serv., 109 F. Supp. 2d. 190, 199 (S.D.N.Y. 2000). Second, O'Diah has

alleged no facts to establish the first element of his claim.  In fact, he presents no

evidence of any disability at all.  Although O'Diah had a urinary tract infection and high

blood pressure, he has failed to allege any facts showing how those conditions have

substantially limited his life activities.  Finally, O'Diah fails to allege any facts that show an

exclusion or denial of benefits based on any alleged disabilities.

Accordingly, defendants' motion as to the ADA claim should be granted.


**J.  Qualified Immunity**

Defendants claim that they are entitled to qualified immunity even if O'Diah's

constitutional claims are substantiated.  Qualified immunity generally protects

governmental officials from civil liability "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d

211, 229-30 (N.D.N.Y. 2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003).  However,

even if the constitutional privileges "are so clearly defined that a reasonable public official

34

would known that his objections might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsy v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry must be discussed with regard to O'Diah's First Amendment claim to be free from retaliation for filing a grievance against abuse claim, and O'Diah's Eighth Amendment claims of excessive force, medical indifference, and medically inappropriate work conditions.  None of O'Diah's other claims need be addressed because, as discussed supra, it has not been shown that defendants violated O'Diah's constitutional rights as alleged in those claims.

There is no question that it was settled in November 2007 and March 2008 that the Eighth Amendment prohibited (1) a corrections officer from assaulting or intentionally inflicting harm on an inmate, Hudson, 503 U.S. at 9-10, and (2) required that inmates are provided "with . . . reasonable safety [as i]t is cruel and unusual punishment to hold criminals in unsafe conditions," Helling, 509 U.S. at 33 (internal quotation marks and citations omitted), whether they pertain to medical care or expectation of protection from corrections staff from dangerous situations.  Thus, accepting all of O'Diah's allegations as true, qualified immunity should not be granted at this stage to (1) Mawhir for his involvement in his use of excessive force against O'Diah and his failure to protect O'Diah

35

from beatings by other inmates; (2) defendants for retaliating against O'Diah for filing grievances alleging beatings; (3) Warner, Dr. Buttarazzi, Stevenson, and Mawhir for assigning him to medically inappropriate work conditions, and (4) Drs. Floresca and Buttarazzi for alleged deliberate indifference to O'Diah's serious medical needs. Defendants' motion on this ground as to those defendants should be denied.

### K.  Statute of Limitations

Defendants' Notice of Motion asserts the affirmative defense of statute of limitations.  Dkt. No. 53.  Defendants, however, fail to discuss this affirmative defense in their Memorandum of Law.  O'Diah addresses this argument.  Dkt. No.  56 ¶¶ 49-50.

While there is no provision in § 1983, § 1988 provides that state law may not apply if inconsistent with the Constitution or federal law.  42 U.S.C. § 1988(a); Moor v. County of Alameda, 411 U.S. 693, 702-03 (1973).  In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by a statute.  See Owens v. Okure, 488 U.S. 235, 249-51 (1989); Romer v. Leary, 425 F.2d 186, 187 (2d Cir. 1970); N.Y. C.P.L.R. 214(2) (McKinney 2003).  Under the "prison mailbox rule," a pro se prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials."  Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (citing Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993); Houston v. Lack, 487 U.S. 266, 270 (1988)).  Here, this affirmative defense should be discussed with regard to O'Diah's First Amendment right to file a grievance against abuse claim, and O'Diah's Eighth Amendment claims of excessive force, medical indifference, and medically inappropriate work conditions.  None of O'Diah's other claims need be

addressed here because, as discussed <u>supra</u>, it has not been shown that defendants violated O'Diah's constitutional rights.

The earliest incident of an alleged constitutional violation that survives defendants' motion to dismiss occurred on September 13, 2007, when Dr. Floresca provided O'Diah with Motrin instead of administering a test for a urinary tract infection.  All other alleged constitutional violations that survive the pending motion occurred after this date.  The second amended complaint is deemed filed on October 23, 2009.[12]  As such, all events giving rise to the surviving claims occurred within the statute of limitations.  Accordingly, defendants' motion is denied on this ground.

### III.  CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 53) be:

1.     **DENIED** as to O'Diah's claims of,

A.  Retaliation, including violations of New York Correction Law § 138(4), against defendants Mawhir, Dr. Buttarazzi, and Warner;

B.  Medical indifference against defendants Dr. Buttarazzi, Dr. Floresca, and Warner;

C.  Medically inappropriate work conditions against defendants Dr. Buttarazzi, Warner, Stevenson, and Mawhir;

---

[12] The original complaint here was filed on July 11, 2008.  Dkt. No. 1.  However, the applicability of the "relation back doctrine" need not be addressed since all claims were asserted within three years of the filing of the second amended complaint.

D.  Excessive force against defendant Mawhir; and

E.  Failure to protect against defendant Mawhir; and

2.      **GRANTED** as to all other claims and all other defendants.


Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated:    December 14, 2010

David R. Homer
U.S. Magistrate Judge

38