**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AROR O'DIAH,

                                        Plaintiff,

        v.                                                      No. 08-CV-322
                                                                     (TJM/CFH)

A. MAWHIR, Cayuga Correctional Facility; P.
BUTTARAZZI, Chief Physician, Cayuga
Correctional Facility Inmate Clinic; JESUS
FLORESCA, Chief Physician, Cayuga
Correctional Facility; K. STEVENSON, Cayuga
Correctional Facility Program Coordinator; MARY
WARNER, Nurse Administrator, Cayuga
Correctional Facility,

                                        Defendants[1].

_____

**APPEARANCES:**                              **OF COUNSEL:**

AROR ARK O'DIAH
Plaintiff Pro Se
07-A-2463
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, New York 14411

HON. ERIC T. SCHNEIDERMAN           ROGER W. KINSEY, ESQ.
Attorney General for the                     Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

        Plaintiff pro se Aror O'Diah ("O'Diah"), an inmate in the custody of the New York State

_____

        [1] Nine defendants were previously dismissed.  Dkt. Nos. 2, 40, 60.

        [2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Department of Corrections and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, five DOCS employees, violated his constitutional rights under the First and Eighth Amendments and related state law alleging violations of his civil rights.  Second Am. Compl. (Dkt. No. 46).  Presently pending are defendants' motion and O'Diah's cross motion for summary judgement, both pursuant to Fed. R. Civ. P. 56.  Dkt. Nos. 67, 74.  Both motions are opposed.  Dkt. Nos. 74, 75.  For the following reasons, it is recommended that (1) defendants' motion be granted, (2) O'Diah's motion be denied, and (3) the complaint be dismissed.

## I. Background

O'Diah initially filed his Second Amended Complaint on April 6, 2010.  Dkt. No. 46.  On April 27, 2010, defendants' filed a motion to dismiss pursuant to Fed. R. Civ. P. 12.  Dkt. No. 53.  On November 14, 2010, a report-recommendation was entering holding that O'Diah's (1) retaliation claims against Mawhir, Buttarazzi, and Warner; (2) medical indifference claims again Buttarazzi, Floresca, and Warner; (3) medically inappropriate work conditions against Buttarazzi, Warner, Stevenson, and Mawhir; and (4) excessive force and failure to protect claims against Mawhir should survive the motion.  Dkt. No. 58 at 37-38.  Moreover, all other claims as to all other defendants should be dismissed.  Id.  This recommendation was adopted in its entirety by Hon. Thomas J. McAvoy by a Decision and Order dated March 16, 2011.  Dkt. No. 60.  Accordingly, despite continued assertions by O'Diah to the contrary, all that remains for decision in the present motion are those claims previously articulated against defendants Mawhir, Buttarazzi, Warner, Floresca, and Stevenson.

2

## A.  Retaliation

O'Diah contends that defendants refuse to provide him with additional medical treatment, after his blood was drawn on March 5, 2008, which would have led to the conclusion that he was unfit for work.  Dkt. No. 74 at 10.  This refusal was in retaliation for O'Diah's actions in returning inappropriate medication which had been prescribed to him a week earlier and for filing grievances regarding prison officials' refusal to refund money which had been unlawfully seized.  Dkt. No. 74 at 10.

## B.  Medical Treatment[3]

On August 22, 2007, a third party physician, Dr. Bartleson, saw O'Diah and ordered x-rays[4] and a urinalysis.  Buttarazzi Decl. (Dkt. No. 67-4) ¶ 6; Dkt. No. 67-13 at 8.  The x-rays were unremarkable, showing only degenerative changes.  Dkt. Nno. 67-13 at 66.  Urinalysis reports from August 29, 2007 indicate that O'Diah's urine showed moderate bacterial amounts and that antibiotics were recommended.  Dkt. No. 67-13 at 20.  On September 6, 2007, O'Diah was given medication for his urinary symptoms.  Buttarazzi Decl. ¶ 8.

On September 13, 2007, while staying at Ulster Correctional Facility ("Ulster") on his way to Cayuga Correctional Facility ("Cayuga"), defendant Dr. Floresca examined O'Diah.

---

[3] Attached to defendant Warner's declaration are a seemingly complete set of O'Diah's medical records for the time in question. Dkt. No. 67-13 at 5-96. While additional copies of the same records were also attached to the other medical defendants' declarations and O'Diah's submissions, for ease and efficiency, citation will only be made to those medical records attached to Warner's declaration.

[4] O'Diah contends in his cross motion that the x-rays showed degenerative changes which should have required a conclusion from medical that he required therapy and received his injuries from "multiple beatings by . . . Mawhir." Dkt. No. 74 at 11.

3

Second Am. Compl. ¶ 43; Floresca Decl. (Dkt. No. 67-10) ¶ 5.  Medical records indicate that O'Diah requested a sick call for pain and symptoms related to an earache.  Dkt. No. 67-13 at 11-12.  O'Diah claimed to be suffering from both ear and urinary tract infections, specifically experiencing severe pain, burning, bleeding and itching.  Second Am. Compl. ¶ 43; Dkt. No. 74 at 8-9.  Dr. Floresca prescribed Motrin for O'Diah, which he refused to take. Second Am. Compl. ¶¶ 43-45; Floresca Decl. ¶ 6.  Dr. Floresca also refused O'Diah's requests to run a urinalysis or provide him with antibiotics.  Second Am. Compl. ¶¶ 44-45, 47, 49.  O'Diah got frustrated by what he perceived to be incorrect treatment, began shouting at Dr. Floresca, Dr. Floresca contacted security, and subsequently ordered O'Diah to be evaluated by mental health.  Second Am. Compl. ¶¶ 45-46; Floresca Decl. ¶¶ 6-7; see also Dkt. No. 67-11 at 2 (misbehavior report authored by Floresca explaining that O'Diah became enraged and belligerent after Floresca's medical assessment), 74-1 at 26 (same); Dkt. No. 67-13 at 11.  O'Diah contends that the failure to provide him with the correct antibiotic when he requested it resulted in lesions occurring in his urinary tract. Second Am. Compl. ¶¶ 57, 60.

On or about September 18, 2007, O'Diah was transferred from Ulster to Cayuga. Second Am. Compl. ¶ 52.  En route to Cayuga, O'Diah stayed at Auburn Correctional Facility whereupon arrival he told medical staff that he had no current health problems.  Dkt. No. 67-13 at 24.  Moreover, upon arrival to Cayuga, O'Diah contended that his present health ailments included headaches and periodic dizziness.  Dkt. No. 67-13 at 26.  Floresca contends that "[t]he transfer [to Cayuga] occurred before any results were obtained and [he] did not have an opportunity to further treat or examine [O'Diah]."  Floresca Decl. ¶ 10.

In the beginning of October, O'Diah's medical records indicate that another urinalysis

4

was ordered by Dr. Bartleson.  Buttarazzi Decl. ¶ 9; Dkt No. 67-13 (urinalysis results).  On October 24, 2007, while incarcerated at Cayuga, O'Diah received an antibiotic from prison officials.  Second Am. Compl. ¶¶ 54-55.  However, O'Diah contends that the antibiotic was insufficient because it only treated gram negative bacteria and he required a drug that would effectively combat both gram positive and negative bacteria.  Second Am. Compl. ¶ 55.  The failure to provide the correct antibiotic caused O'Diah to suffer from headaches, trauma, and dizziness.  Second Am. Compl. ¶ 55.  Furthermore, O'Diah contends that the defendants intentionally attempted to treat him with the wrong medication, prescribing him treatments effective for cancer, epilepsy, and tuberculosis, for the express purpose of poisoning him.  Second Am. Compl. ¶¶ 56.

On November 8, 2007, O'Diah's medical records show that he had completed his antibiotic treatment but still complained of urinary problems and was referred to Dr. Bartleson who, again, ordered another urinalysis.  Buttarazzi Decl. ¶ 10; Dkt. No. 67-13 at 5.  Results from the November 21, 2007 urinalysis indicate no bacteria found in the urine. Dkt. No. 67-13 at 18.  On or about November 21, 2007, O'Diah was still complaining of urinary tract infection symptoms.  Dkt. No. 67-13 at 52.  Urinalysis results from that day indicated the presence of a few bacteria in the urine, thus a follow-up appointment with medical was recommended.  Dkt. No. 67-13 at 17.  O'Diah continued to complain of urinary tract pain from December 14 through the 24.  Dkt. No. 67-13 at 49-51.  Additional urinalysis results on December 26, 2007 indicated the presence of occasional bacteria, but found none in the subsequent urine culture that was performed.  Dkt. No. 67-13 at 64; Dkt. No. 67-13 at 49 (indicating on January 8, 2008 that the urinalysis results and cultures were negative).  O'Diah was seen and treated continuously by Dr. Bartleson until February 13,

2008, when he requested to be seen by a different physician.  Buttarazzi Decl. ¶ 11.

On February 25, 2008, O'Diah was seen by Dr. Buttarazzi and requested antibiotic cream for the lesion on his urinary tract.  Second Am. Compl. ¶ 76.  According to O'Diah, Dr. Buttarazzi asked O'Diah how old he was and prescribed him medication to treat his prostate without conducting any medical tests.  Second Am. Compl. ¶¶ 76-77.  Dr. Buttarazzi recommended this treatment despite O'Diah's subjective observations that he was "seeing microscopic particle[s] coming from . . . [his] urine . . . ."  Second Am. Compl. ¶ 77; Dkt. No. 67-13 at 45 (indicating O'Diah's requests for test to check for bacteria).  Dr. Buttarazzi contends that O'Diah's "labs were normal and the urine culture was negative," so he "ordered a PSA test to ascertain if [the] symptoms were a result of prostate symptoms and not infection."  Buttarazzi Decl. ¶¶ 12-13.  Medication was ordered to treat the prostate symptoms.  Butarazzi Decl. ¶14; see also Dkt. No. 67-13 at 62 (PSA test results indicating numbers higher than normal).  Subsequent urinalysis results from March, April, and May 2008 indicate insignificant or no bacterial presence noted in the urine.  Dkt. No. 67-13 at 57-61.[5]  O'Diah was also sent to a urologist in May of 2008 for a specialty appointment.  Dkt. No. 67-13 at 16.

The following day, February 26, 2007, O'Diah consulted via phone with an unidentified, private physician who informed him not to use the medication provided by Dr. Buttarazzi as it would worsen his pre-existing conditions, and instead to return the prescription.  Second

---

[5] O'Diah also included recent medical records from October 2009 to January 2010, when he was receiving treatment at Wyoming Correctional Facility.  Dkt. No. 74-2 at 19-20.  It appears that his urinary symptoms have still not resolved, as he continues to complain of recurring pain and burning, despite subsequent treatment with different medications and balm.  Id.

Am. Compl. ¶ 78.[6]  O'Diah returned the medication that day.  Second Am. Compl. ¶ 78;

Buttarazzi Decl. ¶ 15; Dkt. No. 67-13 at 45.  Throughout the end of February through April,

O'Diah refused to see certain doctors, report for his sick call, and made requests to be seen

by a urologist and neurologist.  Dkt. No. 67-13 at 34-36, 41-44.

On April 3, 2008, defendant nurse administrator Warren authored an interdepartmental

memorandum "stating that [O'Diah] had been seen some [forty] times between June 1,

2007 and March 14, 2008."  Warren Decl. (Dkt. No. 67-12) ¶ 5; Dkt. No. 67-13 at 2-4

(interdepartmental memorandum outlining all of O'Diah's medical treatment in the prior

eight months), 5-96 (supporting medical records).  Buttarazzi contends that while treating

O'Diah, he also referred O'Diah to a neurologist and for a sleep study, medication, EEG,

and MRI.  Buttarazzi Decl. ¶¶ 16, 18, 20; Dkt. No. 67-13 at 56 (referral to neurology on

February 13, 2008); Dkt. No. 67-13 at 71 (notes from neurology consultation); 67-13 at 55

(request for EEG, MRI, and neurology follow-up).  The results for the MRI and EEG "were

normal and failed to show any abnormality."  Buttarazzi Decl. ¶ 21; see also Dkt. No. 67-13

at 67 (EEG results which are "normal" and without "abnormalities"), 65 (MRI results which

were "unremarkable"); 30 (ambulatory health records indicating normal radiology results).

Additionally, after a specialty consultation with a neurologist, O'Diah refused to take the

medication provided by him.  Buttarazzi Decl.  ¶¶ 17, 22; Dkt. No. 67-13 (refusal to take

neurotonin as prescribed by doctor); Dkt. No. 67-13 at 30, 34 (ambulatory health records

indicating refusal to take medication April and May of 2008.  O'Diah instead contends in his

cross-motion that in lieu of medication, the most appropriate treatments for his headaches

---

[6] O'Diah complained of "chronic dizziness, [and] memory [and] hearing loss d[ue]
t[o a] previous head trauma."  Skt. No. 67-13 at 44, 53.

and dizziness were physical therapy and chiropractics.  Dkt. No. 74 at 13, 15.

### C.  Working Conditions

Defendant Stevenson served as the program coordinator for the work program, whose job included "advis[ing] inmates that an appointment to meet with the program committee ha[d] been made."  Stevenson Decl (Dkt. No. 67-6) ¶ 6.  Stevenson was also tasked with preparing the paperwork for the committee to assist them with making a placement decision for the inmate.  Stevenson Decl. ¶ 7.  The committee includes "representatives from the security staff, counseling staff and administrative staff."  Stevenson Decl. ¶ 8.  Stevenson is not solely responsible for making program assignments.  Stevenson Decl. ¶ 9.  O'Diah contends that the committee structure is just an illusion and that Stevenson is primarily responsible for the decision to grant work assignment exemptions.  Dkt. No. 74 at 31.

On January 22, 2008, O'Diah was sent notification that he would appear before the program committee the following morning at 9 a.m.  Dkt. No. 67-7 at 2.  O'Diah appeared before the committee and was assigned to the lawn care program, to which "he . . . objected that he was too highly educated to mow lawns [and] . . . could not do the lawn work due to a medical condition."  Stevenson Decl. ¶¶ 10-12.  Stevenson concluded that O'Diah "simply did not want to work and wanted a permanent medical excuse even though medical certified him as fit."  Stevenson Decl. ¶ 14; see also Dkt. No. 67-7 at 4 (denying O'Diah's grievance about not being excused from work because "there is no medical indication for a permanent restriction from programming at this time."); Dkt. No. 67-7 at 5-7 (paperwork relied upon when denying grievance requesting permanent excuse from work citing all medical treatment and unremarkable findings rendering O'Diah in satisfactory

medical condition to continue with a work assignment).  O'Diah rejects these conclusions, asserting that he was previously a business owner and that working hard is an essential tenet of his culture.  Dkt. No. 74 at 33.  O'Diah was also encouraged to participate in the GED program, to which he objected claiming multiple levels of higher education including a medical degree, despite the fact that O'Diah "could not provide any indication that he had graduated from high school."  Stevenson Decl. ¶¶ 15-16.

On February 25, 2008, O'Diah began suffering from "irregular and elevated blood pressure and . . . was excused from [the] Work Program, due to [his] excruciating headaches, dizziness and irregular and Elevated Blood Pressure . . . ."  Second Am. Compl. ¶ 79.  On February 26, 2008, O'Diah was issued a medical excuse form that precluded him from working, which was then subsequently extended.  Dkt. No. 67-13 at 90-91, 95-96.  O'Diah's medical excuse from the work programs expired on March 5, 2008.  Second Am. Compl. ¶¶ 79, 81; Dkt. No. 67-13 at 95-96.

On or about February 27, 2008, O'Diah filed a grievance regarding his perceived inability to work.  Dkt. No. 74-1 at 13-18.  This grievance was ultimately denied at all levels of review, citing the various medical tests which showed unremarkable results and medical consults which resulted in benign findings.  Dkt. No. 74-1 at 19-22.

On March 4, 2008, O'Diah claims he was informed by defendant Mawhir that no health personnel would examine him because of O'Diah's history of filing grievances against the staff and because, on February 26, he had returned the medicine prescribed to him by Buttarazzi.  Second Am. Compl. ¶ 80; Dkt. No. 74 at 17.  Mawhir also told O'Diah that he would be placed in segregation the following day, even though O'Diah was not issued a misbehavior report.  Second Am. Compl. ¶ 80; Dkt. No. 74 at 17.  Medical records indicate

9

that on March 4th, O'Diah refused to see Dr. Bartleson and that he would be rescheduled with defendant Buttarazzi on April 7, 2008.  Dkt. No. 67-13 at 44.

On March 5, 2008, O'Diah reported to medical to have his blood work taken and was feeling extremely ill, suffering from "headaches, dizziness, and pains at [his] urinary tract." Second Am. Compl. ¶ 81; see also Dkt. No. 74 at 19.  O'Diah claims his blood was taken and he requested to see a medical professional and seek an extension of his work excuse due to his additional symptoms, but was denied services from defendants Buttarazzi, Warner, and Mawhir after the blood draw.  Second Am. Compl.  ¶¶ 81-82; Dkt. No. 74 at 18.  O'Diah returned to his dorm, still suffering, and was called to report to his work duty on the lawn, grounds, and utility crew.  Second Am. Compl. ¶ 83.  O'Diah contends that defendants were attempting to force him to work, instead of having his medical excuse extended, based upon retaliatory motives by the defendants.  Second Am. Compl. ¶ 83. O'Diah ultimately did not attend the work call-out on March 4 and was given a misbehavior report for his absence.  Dkt. No. 74-1 at 31.[7]

O'Diah's medical records indicate that he was seen by medical personnel on March 5, 6, 7, 12, and 13.  Dkt. No. 67-13 at 42-43.  The sick calls on the 6th and 7th resulted in inmate refusals, with O'Diah refusing to speak or comply with the medical requests.  Dkt. No. 67-13 at 43.

Dr. Buttarazzi contends that he "do[es] not make programming decisions for inmates and did not place [O'Diah] in any work program."  Buttarazzi Decl. ¶ 26.  O'Diah's next medical excuse form for work was completed on May 5, 2008, upon his arrival to Livingston

---

[7] At his subsequent disciplinary hearing for this ticket, O'Diah was found guilty and sentenced to thirty days keeplock and thirty days loss of privileges.  Dkt. No. 74-1 at 32.

Correctional Facility, set to expire two months later.  Dkt. No. 67-13 at 76.  O'Diah contends

that this is illustrative of how severe his medical conditions were.  Dkt. No. 74 at 27.

### D. Excessive Force & Failure to Protect

O'Diah claims that from November 21, 2007 through March 5, 2008, defendant Mawhir

encouraged unidentified corrections officers "to subject [O'Diah] to repeated assaults; by

pouring very cold water on [his] body, and on [his] sleeping mattress . . . whenever [he] was

sleeping."  Second Am. Compl. ¶ 74; see also Dkt. No. 74 at 24 ("Mawhir encourages

Correctional Officers and Inmates to assault[ O'Diah] . . . over 240-days . . . inside SHU

box."), 40 (asserting continued assaults by inmates and corrections officers while Mawhir

watched).  Mawhir denies these allegations, specifically explaining that he "would never

encourage anyone to pour water on a sleeping inmate [because s]uch an act would

endanger both staff and inmates and would be totally inappropriate . . . ."  Mawhir Decl.

(Dkt. No. 67-8) ¶¶ 6-7.  However, Mawhir does state that on November 15, 2007, he began

presiding over a disciplinary hearing for which, on November 21, 2007, he handed down a

guilty disposition of thirty days keeplock and loss of privileges.  Dkt. No. 67-9; Dkt. No. 74-1

at 30 (disciplinary disposition).

### III.  Discussion

O'Diah contends that his (1) First Amendment rights were violated when defendants

failed to provide him medical attention and work excuses in retaliation for returning

medication and filing grievances; (2) Eighth Amendment rights were violated when he was

11

(a) treated with the wrong antibiotics and medication, prevented from undergoing therapy, and continued to suffer various symptoms in response to defendants' deliberate indifference in their treatment; (b) forced to go to his work assignment when defendants knew he was too ill to participate; and (c) subjected to excessive force, and failed to be protected by, defendant Mawhir.  Defendants seek dismissal claiming that O'Diah's contentions are meritless and they are entitled to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.


## B.  Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15.  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

O'Diah has failed to allege successful retaliation claim.  O'Diah contends that he was

deprived medical care on March 4, 2008 for filing grievances and for returning his

medication.  Filing grievances is an action protected by the First Amendment, as is an

individual's constitutional right to refuse medical treatment.  However, O'Diah fails to allege

how grievances which he filed pertaining to his commissary account were discovered, or

served as a motivating factor, in allegedly preventing him from receiving medical care.

Moreover, O'Diah's conclusory allegations that he failed to receive medical care are vitiated

by his medical records which indicate that he was seen by medical personnel on March 4th,

5th, 6th, and 7th.  The record entries indicate that O'Diah was generally uncooperative during

these encounters, refusing to speak with medical personnel and making requests to be

seen by a physician different from the one who generally examined and treated him.  For

the reasons discussed infra, O'Diah's claims of crippling health that day are also mitigated

by the slew of medical reports and diagnostic tests which showed unremarkable results and

normal findings.  Accordingly, O'Diah has failed to raise a question of material fact as to

whether he suffered from any adverse action at all.  Therefore, defendants' motion should

be granted on this ground.


### C.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to

protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970);

Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also

includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.

1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the

condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834.

Second, the prisoner must show that the prison official demonstrated deliberate indifference

by having knowledge of the risk and failing to take measures to avoid the harm.  Id.

"[P]rison officials who actually knew of a substantial risk to inmate health or safety may be

found free from liability if they responded reasonably to the risk, even if the harm ultimately

was not averted."  Id. at 844.


### 1. Medical Care

"'Because society does not expect that prisoners will have unqualified access to

healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson, 503 U.S. at 9).  Because there is no distinct litmus test, a serious medical

condition is determined by factors such as "(1) whether a reasonable doctor or patient

would perceive the medical need in question as 'important and worthy of comment or

treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the

existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir.

2003)(citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the

denial of care should also be judged within the context of the surrounding facts and

circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of

and disregarded the prisoner's serious medical needs."  Chance v. Armstrong, 143 F.3d

698,  702 (2d Cir. 1998).  Thus, prison officials must be "intentionally denying or delaying

access to medical care or intentionally interfering with the treatment once prescribed."

Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment

does not create a constitutional claim" as long as the treatment was adequate.  Chance,

143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the

need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate

grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.

Supp. 2d 303, 312 (S.D.N.Y. 2001).


### a.  Dr. Buttarazzi

O'Diah had been treated for urinary symptoms by a third party doctor, Dr. Bartleson, for

approximately six months before he requested his care be transferred.  Dr. Buttarazzi

began treating O'Diah on or about February 13, 2008.  At that point, the most recent

urinalysis indicated that O'Diah's urine was bacteria-free.

O'Diah requested treatment for urinary symptoms from Dr. Buttarazzi in February of

2008.  Instead, Dr. Buttarazzi treated O'Diah for increased PSA levels, based upon

previous normal labs, negative urine cultures, and an increased PSA value in O'Diah's test

results.  O'Diah contends that he should have been treated with antibiotics.  This amounts

to a disagreement over medication and diagnosis, which is insufficient to state an Eighth

Amendment claim.  Sonds, 151 F. Supp. 2d at 312.  The same argument holds true for

O'Diah's allegations that he was treated with inappropriate medications, better suited for

other ailments for which he was not diagnosed.  O'Diah's disagreements with the medical

decision to prescribe these treatments is merely that, a disagreement.  This does not

warrant constitutional protection.  Id.  Moreover, to the extent O'Diah alleges that the

conclusions provided to him by the unidentified physician on February 26, 2008, which

16

recommended that O'Diah not follow Dr. Butarazzi's treatment, were correct because a different physician prescribed him different medication, are still insufficient to establish an Eighth Amendment violation.  Merely because two physicians decided upon different treatment methods, this remains at worst a difference of opinion and not evidence of deliberate indifference.  See Douglas v. Stanwick, 93 F. Supp. 2d 320, 325 (W.D.N.Y. 2000) ("[T]he fact that [a physician's] directive may have been contrary to [another physician's] . . . does not indicate [deliberate indifference] . . . . Not every physician will treat every ailment in exactly the same manner.  That does not mean that one of the physicians must be acting with deliberate indifference . . . .").

O'Diah's contentions that his urinary symptoms were ignored and improperly treated are negated by the medical records which indicate repeated entries of O'Diah's complaints, along with urinalysis results for the spring of 2008, which indicated insignificant or no bacteria present.  While O'Diah may not have been receiving the exact treatment he desired, it is clear that he was receiving adequate intervention, testing, and treatment, which is all that is constitutionally required.  Chance, 143 F.3d at 703.

Furthermore, any allegations that Dr. Buttarazzi failed to treat O'Diah's other medical complaints of dizziness and headaches is mitigated by the medical records which indicate that Dr. Buttarazzi referred O'Diah for specialty care with a neurologist.  Dr. Buttarazzi also arranged for various diagnostic studies to insure O'Diah was receiving the proper treatment for his subjective complaints.  The test results all indicated that O'Diah was normal.  O'Diah's subsequent arguments that he required physical therapy and chiropractics to adequately treat these symptoms are again nothing more than a disagreement over treatment modalities.  Such disagreements are insufficient to defeat the present motion.

Sonds, 151 F. Supp. 2d at 312.  To the extent O'Diah further decided to ignore the treatment advice, diagnosis, or prescription of medication that Dr. Butarazzi, or any other physician, provided, such decisions by O'Diah to refrain from treatment cannot later be transformed into deliberate indifference on the provider's part.  Those decisions resulted from O'Diah's own choices and actions, and cannot later be imputed on defendants in an attempt to prove liability.  Accordingly, defendants' motion should be granted on this ground.

### b.  Dr. Floresca

Dr. Floresca saw O'Diah when he arrived at Ulster on September 13, 2007.  Medical records indicate that Dr. Floresca was examining O'Diah for ear pain, while O'Diah contends that he was suffering from both an ear and urinary tract infection.  O'Diah alleges that he suggested Dr. Floresca perform tests and provide him with an antibiotic.  The medical records indicate that Dr. Floresca examined O'Diah and prescribed him pain medication, which O'Diah refused to take.  Dr. Floresca's actions in examining O'Diah and prescribing him with medication to alleviate his symptoms mitigates against allegations of deliberate indifference.  To the extent that O'Diah believes different or additional tests should have been run or medication prescribed, such amounts to nothing more than a disagreement over the course of treatment.  Such disagreements are insufficient to establish an Eighth Amendment violation.  Sonds, 151 F. Supp. 2d at 312.

Moreover, as indicated by Dr. Floresca, O'Diah was only scheduled to remain at Ulster for a short period of time, approximately five days.  This truncated schedule, common for housing inmates being transferred, resulted in O'Diah being transferred before Dr. Floresca

had the opportunity to provide additional treatment.  However, this does not detract from the

fact that Dr. Floresca attempted to address O'Diah's symptoms of pain upon his arrival.

O'Diah's decision not to take this medication cannot be transformed into a claim of

deliberate indifference.

Furthermore, upon arriving at Cayuga, medical intake forms indicate that O'Diah was

not complaining of a urinary tract infection.  This is consistent with the medical records at

Ulster which indicated O'Diah was only complaining of an ear ache.  Such records,

completed by completely different and unrelated staff mitigate against O'Diah's contentions

that he subjectively complained of both an ear and urinary tract infection.  At worst, Dr.

Floresca's actions in treating the pain and not running additional tests or providing

antibiotics in response to O'Diah's requests are negligence.  Negligence is not a cognizable

claim under § 1983.  Estelle, 429 U.S. at 106 ("Medical malpractice does not become a

constitutional violation merely because the victim is a prisoner.").  Accordingly, defendants'

motion on this ground is granted.

### c.  Nurse Administrator Warner

Nurse Warner authored an interdepartmental memorandum outlining O'Diah's varied

and significant treatment history.  This memorandum was consistent with the underlying

medical records and represented a true and accurate depiction of the care which O'Diah

received while incarcerated.  The fact that this was then used as a basis for various

grievance decisions was appropriate given its accuracy.  The memorandum also

demonstrated that O'Diah received consistent, almost daily care from the medical

department.  It also outlined O'Diah's propensity to be a difficult patient.  Such actions on

19

O'Diah's part cannot then be transformed into claims for deliberate indifference as O'Diah is the party responsible for failing to interact with the medical department or take the recommended medication.  Accordingly, defendants' motion should be granted on this ground.

### 2. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (citations omitted).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

prisoner's constitutional rights.'" <u>Sims</u>, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." <u>Id.</u> at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> (quoting <u>Hudson</u>, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

O'Diah contends that from November 2007 through March 2008, Mawhir encouraged and participated in pouring water on O'Diah while he was sleeping, without provocation, and randomly assaulting him. All O'Diah has proffered to support this claim are conclusory allegations that unidentified individuals engaged in this behavior on an undisclosed number of occasions spanning a five month period of time. While O'Diah includes Mawhir as the only named individual in this group, he still fails to identify any type of injury incurred by him or provide any specific details about any particular assault by this specific defendant. Such general accusations, without more, are insufficient to establish an Eighth Amendment violation. <u>See</u> <u>e.g.</u> <u>Barr v. Abrams</u>, 810 F.2d 358, 363 (2d Cir. 1987) ("[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a general litany of general conclusions that

21

shock but have no meaning.") (citations omitted).  Accordingly, defendants' motion on this ground should be granted.

### 3.  Failure to Protect

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer, 511 U.S. at 832.  Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31-32 (1993)); see also Matthews, 36 F. Supp. 2d at 124 (same).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).  In order to state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison official must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Matthews, 36 F. Supp. 2d 1 at 124-25 (citing Farmer, 511 U.S. at 834) (internal citations and quotation marks omitted).

Liberally construing O'Diah's complaint, there were similar allegations that Mawhir stood by and watched as other officers and inmates engaged in assaulting O'Diah.  However, these claims too should be dismissed for the same reasons discussed supra, dismissing O'Diah's excessive force claims.  Such generalizations, failing to provide specifics as to

when the assaults occurred, where they occurred, who was involved, how often, or what injuries O'Diah sustained render these claims conclusory and insufficient. Therefore, defendants' motion on this ground should be granted.

### 4. Work Conditions

As noted in the report-recommendation, a "New York [state] . . . prisoner has no protected liberty interest in a particular job assignment . . . [h]owever, forcing O'Diah to complete a job . . . with the intention of aggravating his medical condition could state a claim for violating . . . [his] conditions of confinement." Dkt. No. 58 at 20 (citations and internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

O'Diah contends that defendants Warner, Dr. Buttarazzi, Stevenson, and Mawhir precluded him from receiving medical treatment, and thus the extension of his medical excuse, instead forcing him to return to work on the grounds crew which each member knew would aggravate his preexisting medical conditions, specifically his headaches, dizziness, and irregular blood pressure.  O'Diah's contentions fail to establish an Eighth Amendment violation.  First, O'Diah fails to establish that defendants precluded him from receiving his medical excuse.  As previously noted, medical records indicate O'Diah had some form of contact with medical personnel on March 4th, 5th, 6th, and 7th, in contravention of his allegations that all medical treatment was terminated.  Moreover, medical records indicate that O'Diah was perfectly fit to engage in his work program.  The fact that he received excuses both previous and subsequent to March 5th fails to establish a per se conclusion that O'Diah should never work.  This is especially significant when one considers that months elapsed between the time the work excuses were granted.  Furthermore, O'Diah has failed to mention how this work assignment specifically injured him or deprived him of one of his needs.  The alleged injury was speculative and contradicted by the objective evidence provided in the medical record.

Second, O'Diah fails to establish that any defendant subjectively acted with a sufficiently culpable state of mind.  Dr. Buttarazzi had no part in the work selection committee, and there is no evidence that he interacted or influenced these individuals in

24

their decision making.  Moreover, despite O'Diah's conclusory allegations to the contrary, it is undisputed that Stevenson is a member of a committee, composed of multiple individuals from different disciplines, which together determines the appropriate work placement for inmates.  Stevenson is the only named defendant on that committee.  There is nothing in the record which indicates, or from which one could infer, that the other committee members were influenced by any of the other named defendants.  Furthermore, Mawhir was not involved in calling the dorm or authoring the misbehavior report which was ultimately responsible for sending O'Diah to SHU on March 5th.  Accordingly, there is nothing to substantiate Mawhir's involvement in O'Diah's work placement or subsequent reprimand.  The same is true for defendant Warner.  Accordingly, defendants' motion should be granted on this ground.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

25

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached because, as discussed supra, accepting all of O'Diah's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted as to all defendants in all respects.

### E.  Pendent State Law Claims

Liberally construing O'Diah's second amended complaint, he alleged that various defendants violated New York Correction Law § 138(4).  Dkt. No. 58 at 13-14.  Federal courts have supplemental jurisdiction over such pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended herein, however, that defendants be granted judgment on all O'Diah's federal claims, on which rests federal jurisdiction over the pendent state law claims.  O'Diah asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over O'Diah's state law claims if the recommendations herein are accepted. See 28 U.S.C. § 1367(c)(3). Accordingly, such causes of action should be dismissed without prejudice.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Dkt. No. 67) be **GRANTED** as to all claims and all defendants and the complaint **DISMISSED** in its entirety; AND

2. O'Diah's cross-motion for summary judgment (Dkt. No. 74) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  September 5, 2012
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge